UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROBERT A. LYNCH,

                        Petitioner,          **No. 1:12-CV-0974(MAT)**
          -vs-                               **DECISION AND ORDER**

SUPERINTENDENT DOLCE,

                        Respondent.

## I.   Introduction

Robert A. Lynch ("Lynch" or "Petitioner") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his detention in Respondent's custody. Lynch is incarcerated as the result of a conviction entered on September 8, 2005, in New York State County Court, Monroe County (Keenan, J.) following a jury verdict convicting him of one count of Robbery in the First Degree (N.Y. Penal Law § 160.15(3)); two counts of Robbery in the Second Degree (id., § 160.10(1), (2)(a)); and one count of Robbery in the Third Degree (id., § 160.05).

## II.  Factual Background and Procedural History

### A.   The Robbery

At about 6:45 p.m. on October 28, 2004, Rachel Tally-Verstraten ("Tally") drove to the Family Dollar Store located on North Clinton Avenue in the City of Rochester. Her two young daughters were in the backseat of the car. As Tally pulled into a space in the parking lot, she noticed that the four-door sedan next to her was occupied by two black males. Tally got out of her car

and began to unbuckle her daughter's seatbelt. As she did so, she immediately felt someone, later identified by eyewitnesses as Petitioner, place one hand on the left-hand-side of her waist and shove something into the right-hand-side of her waist. Petitioner told Tally it was a robbery, that he had a gun, and that he would "shoot her in front of her kids" if she did not give him her purse. T.478-80. Tally asked Petitioner if he was kidding; he replied that he was not, and stated that he would hurt Tally and her children if she did not comply. When she insisted that she did not have anything of value, he asked what she had and where she had it. He then touched Tally's right front pocket and she shoved him away from her. At that point, she saw that Petitioner was approximately her height (she is five-feet, seven-inches tall) and was wearing a black hooded sweatshirt, dark pants, a few gold necklaces. T.480-81, 485.

Petitioner then grabbed Tally's purse; she initially held onto it but released it after Petitioner punched her in the face. T.481-82. The same four-door vehicle Tally had noticed earlier pulled forward. The driver, later identified as Rodney Brandon ("Brandon" or "co-defendant"), told Petitioner to get inside. Petitioner did so and Brandon drove out of the plaza and onto the parkway. Tally called 911 and reported the crime.

During the purse-snatching, Ediberto Diaz, Sr. ("Diaz Sr.") had been sitting in their parked van in the parking lot, about four to five feet away, with his twenty-year-old son, Ediberto Diaz, Jr.

("Diaz Jr."). They both saw Petitioner punch Tally, take her purse, and get into a black Dodge Stratus after the driver opened the passenger-side door for him. The Stratus then drove out of the parking lot  and onto the parkway.

Diaz Sr. and Diaz Jr. continued on their way to a storage facility located on Lake Avenue. As Diaz Sr. turned his vehicle onto Lake Avenue from Route 104, a black Dodge Stratus swerved in front of them. Diaz Sr. and Diaz Jr. recognized the Stratus as the same car involved in the robbery at the Family Dollar. According to Diaz Jr., the Stratus was occupied by the same two men whom they had watched commit the robbery. T.306-07. As the Stratus was being driven down Lake Avenue, its occupants were throwing papers out of the car windows. When the Stratus pulled into the Hess gas station on Lake Avenue, Diaz Sr. called the police from a nearby mini-mart.

Rochester Police Department Officers Bob Hill and Matt Hill responded to the scene and quickly located the Dodge Stratus, parked and unoccupied, at the rear of the Hess station. Diaz Jr. yelled to the officers that the two individuals who were crossing Lake Avenue, one in a white hat (Petitioner) and the other in a grey sweatshirt (Brandon), had just done the "jacking at the Family Dollar[,]" T.311, meaning that they "took the purse away from the lady." Id.; see also T.366, 626-30. As soon as the officers made eye contact with Petitioner and Brandon, they began running in a westbound direction. After a brief pursuit, Petitioner stopped, apparently because he had lost one of his shoes. Officer Matt Hill

ordered him to the ground, handcuffed him and took him into custody. T.629. As the officers were transporting Lynch to the show-up, he spontaneously said, "I know I shouldn't have gotten into that car." T.632.

Petitioner was subsequently identified during a show-up identification procedure, conducted at 7:59 p.m., by both Diaz Sr. and his son as being "the guy who did the robbery at the Family Dollar". T.317, 376. After the show-up, he spontaneously stated, "I got to be a free suspect for somebody." T.632.

Tally told the police that she was "80 percent certain" that Petitioner was her assailant and that she had "no doubt" that the Dodge Stratus, which she viewed at the Hess gas station, was the same vehicle in which her assailant had fled the scene. T.490, 494. Tally also identified the purse, located on the floor of the front passenger side of the Stratus, as being the one Lynch had stolen from her.

Petitioner provided several statements to the police, initially denying involvement in the robbery and claiming that prior to his arrest, he had been at a friend's house on Ravine Avenue before heading to the Hess station on Lake Avenue. He told the police that he ran from them because someone told him the police were there and that he had to run. T.570. Petitioner later claimed that his friend "Jay" had picked him up on Ravine and had driven him to the Hess gas station. T.571-72. Petitioner also accused the police of "setting him up." T.575, 578. Petitioner

-4-

ultimately gave a written statement in which he admitted to having "run up on" the victim and to having "bumped her in the mouth" before taking her purse. T.600. When asked if everything in his written statement was true, Petitioner replied, "[Y]es, it is, but I don't think signing it is going to help me." T.602.

When Brandon was taken into custody, a pat search revealed that he had an unloaded handgun in the waist of his pants and a magazine containing six bullets in  the pocket of the jacket he was wearing. Testing revealed that the handgun and two of the rounds of ammunition were operable.

**B.   The Convictions**

Indictment 0989/2004 charged both Brandon and Petitioner, individually and under a theory of accomplice liability, with two counts of first degree robbery and two counts of robbery in the second degree. Brandon was charged individually with criminal possession of a weapon in the second and third degree.

Brandon and Petitioner were tried jointly. Brandon was acquitted after their joint trial of the robbery charges, but he was convicted of one count of criminal possession of a weapon in the second degree and one count of criminal possession of a weapon in the third degree. His conviction was affirmed on direct appeal.

Petitioner was convicted of robbery in the first degree, two counts of second degree robbery and one count of third degree

-5-

robbery. He was sentenced to an aggregate term of 12 years, plus 5 years of post-release supervision.

### C.   Post-Conviction Proceedings

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. On February 10, 2011, the Appellate Division unanimously affirmed the judgment of conviction, and on July 13, 2011, the New York Court of Appeals denied leave to appeal. People v. Lynch, 81 A.D.3d 1292 (4th Dept.), lv. denied, 17 N.Y.3d 807 (2011).

Petitioner then filed a pro se application for a writ of error coram nobis, asserting that appellate counsel provided ineffective assistance on a number of bases. The Appellate Division summarily denied the application. Petitioner then sought leave to appeal on one ground—that appellate counsel failed to argue that the trial court erroneously refused to charge "actual possession" in regards to the first-degree robbery count (P.L. § 160.15(3)). The New York Court of Appeals denied leave to appeal.

### D.   The Federal Habeas Petition

In his timely pro se habeas petition dated October 2, 2012, Lynch raises the following grounds for habeas relief: (1) appellate counsel was ineffective for failing to argue that the trial court improperly refused to charge "actual possession" as an element of first-degree robbery under P.L. § 160.15(3); (2) appellate counsel was ineffective for failing to argue that trial counsel was

ineffective for failing to (a) object to the verdict as repugnant because Petitioner was acquitted of first-degree robbery under the theory that he was armed with a deadly weapon (P.L. § 160.15(2)), but convicted of first degree robbery under the theory that he used or threatened to use a dangerous instrument (P.L. § 160.15(3)); (b) assert that the prosecution failed to establish that Petitioner "actually possessed" a dangerous instrument at the time of the crime; (c) introduce the 911 tape into evidence; and (d) impeach Tally with the 911 tape; (3) trial counsel was ineffective for the individual and cumulative effects of his failure to (a) object to the verdict as repugnant and based on legally insufficient evidence; (b) introduce the 911 tape into evidence; and (c) impeach Tally with the 911 tape; and (4) the trial court improperly excluded the 911 tape.

Respondent answered the petition, arguing that Petitioner's ineffective assistance of trial counsel claims are unexhausted but procedurally defaulted because they were never raised in any state-court forum and cannot be raised now. Respondent also argues that Petitioner's ineffective assistance of appellate counsel claims based on trial counsel's ineffectiveness were unexhausted because Petitioner did not seek leave to appeal the denial of coram nobis relief as to those claims. Respondent asserts that none of Petitioner's claims merit habeas relief. Petitioner filed a reply in which he sets forth further argument concerning the merits of

his claims but does not address Respondent's procedural default and exhaustion arguments.

For the reasons set forth below, the petition is dismissed.

## III. Exhaustion and Procedural Default

A habeas petitioner generally must exhaust all state-provided remedies before seeking review in federal district court. See 28 U.S.C. § 2254(a); O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999). The Supreme Court has held that where a question of federal law is decided by a state court on "a state law ground that is independent of the federal question and adequate to support the judgment[,]" Coleman v. Thompson, 501 U.S. 722, 729 (1991) citations omitted), the claim is procedurally defaulted and will not be reviewed on the merits by a federal habeas court, see id.

The Court declines to resolve the issues raised by Respondent's assertion of the defenses of non-exhaustion and procedural default, and instead proceeds directly to consideration of the merits of Petitioner's claims. See Lambrix v. Singletary, 520 U.S. 518, 523 (1997) (stating that bypassing procedural questions to reach the merits of a habeas petition is justified "if the [underlying issues] are easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law"); Boddie v. New York State Div. of Parole, 288 F. Supp.2d 431, 439 (S.D.N.Y. 2003) ("[P]otentially complex and difficult issues about the various obstacles to reaching the merits [of a habeas petition] should not be allowed to obscure the fact

-8-

that the underlying claims are totally without merit.") (quotation omitted).

## IV. Merits of the Petition

### A. Erroneous Preclusion of the 911 Tape

#### 1. Overview

Petitioner sought to introduce into evidence a tape-recording of Tally's call to 911 immediately after the robbery to impeach Tally's trial testimony that her assailant wore "dark" pants and that she had no recollection of telling the 911 operator that the pants were "black". T.687-91, 753. The trial court assumed that the parties were "all agreeing to what is contained in the evidence, and normally that would mean you're agreeing to what these conversations are", that is, "what is recorded." T.688.

However, the prosecutor and co-defendant's counsel would not stipulate that the tape's contents truly represented the content of the original 911 call. T.689. Petitioner's counsel then reiterated why he believed the tape was important and constituted a prior inconsistent statement. T.689. The trial court noted that defense counsel did not confront Tally with the tape-recording, commenting, "[You] could have played the tape. You didn't. And it's important. I'll need to go through notes question by question and see what you did ask her, what her response was. And you'll be allowed to impeach with this." T.690. Trial counsel agreed that this was "[f]air enough." At that point, the colloquy turned to other

matters, including the parties' motions for trial orders of dismissal.

The trial court eventually returned to the issue of the 911 tape and asked if defense counsel had the telecommunicator from the Office of Emergency Communications ("OEC") who received Tally's 911 call. Defense counsel replied in the negative. T.707. The trial court then set forth the parameters of the stipulation:

> THE COURT: [A]s I understand it now, the stipulation only was that the copy that apparently was made and given to the defense counsel is an exact duplicate of an original recording received at the OEC Center on a given date and over a period of several hours that would satisfy one portion of the foundational element or introduction of the tape. . . . So I just wanted to clarify that stipulation because it may be important to how you proceed, Mr. Cocuzzi.

T.710-11.

After co-defendant's counsel rested, the prosecutor objected to the admission of the 911 tape by Petitioner's counsel, noting that there "has been no foundation by any witness that would permit the introduction" of the tape, since the stipulation "just goes to the authenticity of the copy. . . ." T.752. Petitioner's counsel responded that he had asked Tally "about what she said on the 911 call, she said she didn't remember." T.753. The trial judge reserved decision for the purpose of reviewing his notes. Id.

The following day, the trial judge stated that he would exercise his discretion to allow the defense to present the alleged impeachment evidence (with regard to Tally's descriptions of the robber's clothing) contained on the 911 tape, T.777-78, provided

-10-

that "a proper foundation and authentication is made of the tape by the defense[,] as the stipulation that was entered into by the parties would cover really only one portion of the authentication of the OEC recording." T.778.

Trial counsel responded that he had called the individual who had made the tape-recorded copy of 911 call (but who had not actually taken the call). He admitted, however, he did not know who the 911 operator was. Tally could not testify as to the tape's contents, because she had no recollection of anything she said to the 911 operator. T.779-80. Moreover, she had never listened to the tape. T.780. Trial counsel stated that he was under the impression that the tape was self-authenticating once the stipulation was entered into because the tape was subpoenaed by the prosecution, was in their possession, and could have been played for Tally by the prosecution. He argued that the stipulation clearly established that the tape was identical to the original recording.

The trial court explained that although the tape was identical to a recording made at the OEC, without a stipulation, there was "no way for the jury to know what this recording is of and who is on it. . . ." Counsel argued that it was self-authenticating by virtue of the fact that Tally identified herself on the tape. T.782. After the trial court read from controlling New York case regarding the methods in which a tape could be authenticated, trial counsel asked to have Tally recalled. The prosecutor then objected to the admission of the tape at all, noting he could "do nothing to

rehabilitate what is played back on the tape. . . ." T.784. The trial court noted that an opportunity for rebuttal would be available, and that the prosecution's position was incorrect–it was not impeachment of a witness who was no longer present, it was collateral impeachment of a witness by the defendant, which is allowed under appropriate circumstances (i.e., where an individual has been confronted with an alleged prior inconsistent statement). T.787.

At about 5:30 p.m. that evening, the trial court left a voicemail message for defense counsel, directing him to be prepared the following day to present the additional necessary foundational evidence for the tape to be admitted. T.783. By the next morning, however, defense counsel had not ascertained the name of the 911 operator, so the trial court recessed for the remainder of the morning so that counsel could locate the operator. T.785-86.

Eventually, defense counsel ascertained the name of the operator, and a phone call was placed to her residence. Defense counsel requested an adjournment to attempt to have the witness picked up and brought to the court, and the trial court granted the request, indicating that the proceedings would reconvene at 11 a.m. At 11 a.m., the operator had not yet been located. Defense counsel asserted that the foundation could be laid if the trial court were to take judicial notice that the voice on the tape was Tally's voice because, according to counsel, "[i]t is distinctive." T.804. The trial court declined to do so and then sua sponte announced,

"[U]nder the circumstances, I'll not grant a further adjournment of the trial." Id. Defense counsel then rested. T.803-04.

Petitioner raised this alleged evidentiary error on direct appeal, arguing that his constitutional right to present a defense had been abridged. The Appellate Division concluded, without discussion, that the claim was "without merit." Lynch, 81 A.D.3d at 1293.

### 2.  Analysis

It is "well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt." Grotto v. Herbert, 316 F.3d 198, 206 (2d Cir. 2003) (citing Taylor v. Illinois, 484 U.S. 400, 409 (1988); Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987)). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 411. "'Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right' to present a meaningful defense." Washington, 255 F.3d at 56 (quoting Agard v. Portuondo, 117 F.3d 696, 705 (2d Cir. 1997), rev'd on other grounds, 529 U.S. 61 (2000)).

For a tape recording to be admitted at trial under New York State's evidentiary rules, the proponent is required to offer proof of the recording's authenticity. People v. Ely, 68 N.Y.2d 520, 527,

-13-

(1986). Authenticity can be established in a variety of ways, such as (1) by eliciting testimony from a participant in the conversation that the recording is a complete and accurate reproduction of the conversation, (2) by eliciting similar testimony from a witness to the conversation or to its recording, (3) by proffering participant testimony together with that of an expert whose analysis reveals no alterations, or (4) by establishing an unbroken chain of custody. Id. at 527-28.

Here, because defense counsel did not ask the caller, Tally, to authenticate the tape, he was required to meet his burden in some other way consistent with the standard set forth in Ely. This, however, he failed to do. Counsel did not call the 911 operator as a witness in a timely fashion and, after being given an adjournment to locate this witness, was unable to do so. Instead, counsel asked the trial court to take judicial notice that the voice on the tape belonged to Tally. The trial court properly denied this request, for "identity and authenticity are separate facets of the required foundation, both of which must be established." Ely, 68 N.Y.2d at 528; see also id. (stating "in view of the ease with which voices may be transposed on tapes and the difficulty, except for an expert, of detecting such a change," both identity and authenticity "must necessarily be" established). Without a doubt, the trial court correctly applied New York's evidentiary law with regard to the admission of tape-recordings.

Where, as there, the state court's evidentiary ruling was correct as a matter of state evidentiary law, the habeas court's "inquiry is more limited[,]" addressing itself only to "whether the evidentiary rule is 'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" United States v. Scheffer, 523 U.S. at 308 (quoting Rock v. Arkansas, 483 U.S. at 56); see also Holmes v. South Carolina, 547 U.S. 319, 323-25 (2006); Monk v. Bradt, 778 F. Supp.2d 352, 368 (W.D.N.Y. 2011) (citations omitted). "Rules of evidence have been developed over centuries to ensure that juries in our judicial system consider, and base their decisions on, only evidence that is reliable." Farkarlun v. Hanning, 855 F. Supp.2d 906, 921 (D. Minn. 2012) (citing 1 MCCORMICK ON EVIDENCE (6th ed.) § 10 ("The common law system of proof is exacting in its insistence on the most reliable sources of information.")). The rule applied by the trial judge in Lynch's case which requires the proponent of a tape-recorded 911 call to establish a proper foundation, i.e., that the evidence is what the party claims, is neither "arbitrary" nor "disproportionate" to the purpose it designed to serve. Cf. Washington v. Texas, 388 U.S. 14, 23 (1967) (state statutes providing that persons charged in the same crime cannot be introduced as witnesses for each other violated defendant's right to compulsory process; rule arbitrarily denied defendant the right to call a witness who was physically and mentally capable of testifying to events he had personally observed, and whose testimony would have been relevant and material

to the defense). Moreover, the foundational rule was not applied to Lynch's case in an arbitrary manner by the trial judge, who, as discussed above, gave defense counsel ample opportunity to lay the proper foundation to have the 911 recording admitted. The Court accordingly concludes that Lynch was not denied his constitutional right to present a defense by the trial court's exclusion of the tape-recording due to defense counsel's failure to lay a proper evidentiary foundation.

### B.   Ineffective Assistance of Trial Counsel

#### 1.   Legal Principles

In order to establish that he received ineffective assistance of trial counsel, Petitioner must show both that his attorney provided deficient representation and

that he suffered prejudice as a result of that deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient representation means that "counsel's representation fell below an objective standard of reasonableness," and "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result." Id. at 686, 688. The "prejudice" prong requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

2.    **Counsel's Alleged Errors**

a.    **Failure to Object to Repugnant Verdicts**

Petitioner faults trial counsel for failing to object the verdict as repugnant, on the basis that he was convicted of third-degree robbery as a lesser-included offense of first-degree robbery under P.L. § 160.15(2), and also convicted of first-degree robbery under P.L. § 160.15(3).

Under New York law, "[t]wo counts are 'inconsistent' [or 'repugnant'] when guilt of the offense charged in one necessarily negates guilt of the offense charged in the other." N.Y. CRIM. PROC. LAW § 300.30(5). Repugnancy is evaluated by comparing the elements of the crime against the jury instructions as given, without regard to the accuracy of those instructions and without regard to the particular facts of the case. People v. Muhammad, 17 N.Y.3d 532, 539 (2011) (citation omitted); see also, e.g., Flowers v. Ercole, 06 Civ. 6118, 2009 WL 2986738, at *18 (S.D.N.Y. Sept. 18, 2009) (When determining repugnancy, a court's "focus is on the elements of the crime *as charged*, not on the evidence.") (citing People v. Green, 71 N.Y.2d 1006, 1008 (1988); emphasis in original).

Here, the trial court charged the jury that a person is guilty of first-degree robbery under P.L.§ 160.15(2) "when that person forcibly steals property and when in the course of the commission of the crime or of an immediate flight therefrom, that person or another particip[ant] in the crime is armed with a deadly weapon." T.924. "Deadly weapon" was defined as "any loaded weapon from which

a shot readily capable of producing death or other serious physical injury may be discharged. Id. With regard to first-degree robbery under P.L. § 160.15(3), the trial court charged that a person is guilty of that offense when he "forcibly steals property and when in the course of the commission of the crime or of immediate flight therefrom, that person or another participant in the crime uses or threatens the immediate use of a dangerous instrument," which in this case was a handgun. T.926-27.  "Dangerous instrument" was defined as an "instrument, article or substance which under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or other serious physical injury." T.926. The court cautioned that serious physical injury "need not in fact be caused." T.926.

Based on these instructions and the elements of the two crimes, the jury reasonably have found that Petitioner was carrying an unloaded handgun, which was not a "loaded weapon . . . from which a shot readily capable of producing death or other serious physical injury may be discharged . . . ." However, the jury reasonably could have found that an unloaded handgun is an "instrument, . . . which under the circumstances in which it is . . . threatened to be used is readily capable of causing death or other serious physical injury. . . ." For example, Petitioner could have used the unloaded handgun as a bludgeon to pistol-whip Tally. See Muhammad, 17 N.Y.3d at 542 ("Other examples of assault without possession of an injury-causing instrumentality include a situation

where the People fail to prove that a handgun was operable but show that the accused used it as a dangerous instrument to pistol whip the victim and cause physical injury. . . .”). Thus, “[a]n objection to the verdict as inconsistent would have been meritless, and trial counsel cannot be faulted for failing to make it.” Epps v. Poole, 07 Civ. 3432, 2010 WL 1991517, at *8 (E.D.N.Y. May 14, 2010).

### b.  Failure to Preserve Legal Insufficiency Claim

Petitioner asserts that trial counsel failed to preserve his claim that the evidence was insufficient to establish “actual possession” of a dangerous instrument. However, appellate counsel raised an insufficiency of the evidence claim on direct appeal, and the Appellate Division denied the claim on the merits. See Lynch, 81 A.D.3d at 1293 (“Contrary to defendant's further contention, the evidence is legally sufficient to support the conviction . . . .”). Given that the Appellate Division addressed the claim on the merits, and did not find the claim unpreserved, counsel cannot be faulted for not preserving the claim by making a timely and specific motion for at trial order of dismissal. See Williams v. Garvin, 97 Civ. 1257, 1997 WL 433397, at *2 (E.D.N.Y. July 21, 1997) (denying claim that “appellate counsel should have argued that petitioner was denied effective assistance of trial counsel as a result of his trial counsel's failure to preserve a sufficiency of evidence claim for appellate review” because appellate court “in fact rejected a sufficiency of the evidence claim on the merits”).

### c.    Failure To Introduce 911 Tape for Impeachment Purposes

Petitioner contends that his trial counsel was ineffective for failing to introduce the 911 tape into evidence for purposes of impeaching Tally, the victim. Even if counsel properly laid a foundation for the 911 tape to be introduced, and Tally's description of Petitioner's clothing to the 911 operator were as represented them, the impeachment value was minimal. As noted above, Tally apparently told the 911 operator that the robber was wearing "black" pants, but testified at trial that he was wearing "dark" pants. This minor discrepancy would have had no appreciable effect on the jury's deliberations regarding Tally's credibility or Petitioner's guilt. Thus, there is no "reasonable probability" that but for trial counsel's alleged shortcomings in regard to the 911 tape, the outcome of Petitioner's trial would have been more favorable. See Rodriguez v. Portuondo, 01 Civ. 547, 2006 WL 2168314, at *10 (S.D.N.Y. Aug. 1, 2006) ("Whether counsel's failure to impeach violates the Sixth Amendment depends upon the extent to which impeachment evidence would have affected the outcome of the case . . . .").

### d.    Cumulative Effect of Counsel's Errors

"[T]he accumulation of non-errors does not warrant a new trial." United States v. Lumpkin, 192 F.3d 280, 290 (2d Cir. 1999) (citation omitted). Here, as discussed above, the deficiencies attributed to Petitioner's trial counsel were not in fact errors at

all. Thus, considering them in the aggregate does not change this Court's conclusion that Petitioner received effective assistance as guaranteed by the Sixth Amendment throughout his criminal proceedings.

### C.   Ineffective Assistance of Appellate Counsel

#### 1.   Legal Principles

When a state authorizes a criminal appeal, it must provide indigent defendants with counsel for their first appeal as of right. Ross v. Moffitt, 417 U.S. 600, 607 (1974) (citing Douglas v. California, 372 U.S. 353, 358 (1963)). The two-pronged test set out in Strickland, 466 U.S. 668, supra, "applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right." Aparicio, 269 F.3d at 95 (citing Evitts v. Lucey, 469 U.S. 387, 396-97 (1985)).

In order to satisfy the first prong of Strickland, the petitioner must demonstrate that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000). It is not sufficient for the petitioner to point out that counsel declined to raise a nonfrivolous or colorable argument, for counsel does not have a duty to advance every nonfrivolous or colorable argument that could be made. Evitts, 468 U.S. at 394; Jones.  To satisfy the second prong of Strickland, the petitioner must show that if appellate counsel had not performed deficiently, there was a reasonable probability that

[the petitioner's] appeal would have been successful before the state's highest court. Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir.), cert. denied, 513 U.S. 820 (1994).

### 2.   Arguments Omitted by Appellate Counsel

#### a.   Failure to Charge "Actual Possession"

Petitioner faults appellate counsel for failing to argue that the trial court improperly denied trial counsel's request to charge "actual possession" as an element of first degree robbery under P.L. § 160.15(2). During the charge conference, defense counsel requested that the trial court "the jurors that the essential element before an individual can be convicted of [P.L. § 160.15(3)]. . . that they find that in fact that that individual was in possession of a dangerous instrument." T.774. The trial court reserved decision on this and counsels' other requests to charge. T.776.

The following day, trial counsel reiterated his request that the court "charge the additional element that the robber/defendant in fact possessed a dangerous instrument" in connection with the second count of the indictment. T.801. The trial judge responded, "Based on my review of the Court of Appeals cases[1] I cited, I will deny your request." Id. The trial judge subsequently issued the pattern jury instruction for P.L. § 160.15(3), stating, in

---

[1]

The trial court is referring to People v. Pena, 50 N.Y.2d 400 (1980), aff'g, People v. Turrell, 66 A.D.2d 862 (2d Dept. 1978).

pertinent part, that a person is guilty of first-degree robbery under that section when, "during the commission of the crime or immediate flight therefrom, he or another participant in the crime used or threatened the immediate use of a dangerous weapon; to wit, a handgun." T.927.[2]

Prior to the jury commencing deliberations, the trial judge asked counsel whether there were "any requests or exceptions to the charge other than those previously made a part of the record[.]" T.947. Both attorneys replied in the negative. T.947-48.

In his coram nobis application, Petitioner argued that appellate counsel was ineffective in failing to argue that the trial court erred in declining to specifically instruct the jury on "actual possession". Petitioner cited a case decided three years after his trial, People v. Ford, 11 N.Y.3d 875 (2008), in which the New York Court of Appeals "reaffirmed the principles . . . announced in Pena and concluded 'that the use or threatened use' language of first-degree robbery under Penal Law § 160.15(3) 'requires proof of actual possession' of a dangerous instrument[.]" People v. Grant, 17 N.Y.3d 613, 618 n.2 (2011) (quoting Ford, 11 N.Y.3d at 877 n. 1); internal quotation marks omitted in Grant)).

Following the Ford decision, New York's pattern criminal jury instructions for first-degree robbery under Penal Law § 160.15(3)

---

[2]

The Court notes that at the time of Petitioner's trial in 2005, the language in that charge correctly stated the law and was essentially the same as that contained in the then-current pattern criminal jury instructions.

were amended to include language that "the People must prove
defendant 'possessed a dangerous instrument[.]'" Grant, 17 N.Y.3d
at 619 n.3 (quoting Criminal Jury Instructions 2d (N.Y.) Penal Law
§ 160.15(3) (rev. Jan. 5, 2009)). In Ford, the trial court
explained that to find the defendant guilty of first-degree
robbery, the jury would have to find, in pertinent part, that "the
defendant used or threatened the immediate use of a knife; [and]
third, that under the circumstances *the knife* was a dangerous
instrument." Ford, 11 N.Y.3d at 878 (quotation omitted; alteration
in original; emphasis supplied).

The Court of Appeals that this charge did not adequately alert
the jury to the "actual possession" element of first-degree
robbery:

> More than a subtle verbal clue [i.e., the reference to
> "the knife"] was necessary for the jury to be put on
> notice of its obligation to decide whether defendant
> actually possessed a knife; it is not enough for an
> instruction merely to imply the elements of a crime. . .
> . . [T]he charge in this case did not use the term
> 'actual possession,' or in any other way convey that
> requirement to the jury. Although the jury instruction
> parroted the statute, we have previously noted that the
> 'actual possession' requirement is not explicit in the
> statute, but rather is based on judicial interpretation
> in decisional law[.]

Ford, 11 N.Y.3d at 878 (citing Pena, 50 N.Y.2d at 407; other
citation omitted). The charge given here at Petitioner's trial was
in all respects the same as that given in Ford, except the type of
dangerous instrument was a knife in Ford, rather than a handgun.
Comparing the charge in Petitioner's case to the inadequate charge

in Ford, Petitioner did have a colorable argument that the trial court erred in declining to charge "actual possession."

The Court is not prepared to say, however, that appellate counsel was "outside the wide range of professionally competent assistance" in failing to press an argument based on Ford on appeal. The Court notes that in responding to Petitioner's coram nobis motion, the prosecutor argued that the claim was unpreserved because trial counsel had failed to register a specific objection after the trial court issued the charge in question. Courts in this Circuit have consistently held that appellate counsel should not be faulted for failing to raise an unpreserved claim. E.g., Carroll v. David, 2009 WL 666395, at *11 (N.D.N.Y. Mar. 11, 2009) (citing Clarke v. Goord, No. 07-CV-0366, 2007 WL 2324965, at *6 (E.D.N.Y.2007) ("It cannot be unreasonable for appellate counsel not to raise an unpreserved issue on appeal."); Aparicio v. Artuz, 269 F.3d 77, 96 (2d Cir. 2001); Weathers v. Conway, No. 05-CV-139S, 2007 WL 2344858, at *5 (W.D.N.Y. Aug. 15, 2007); see also Montalvo v. Annetts, 02 CIV.1056 LAK AJP, 2003 WL 22962504, at *27 (S.D.N.Y. Dec. 17, 2003) (collecting cases).

After reviewing the transcript, the Court questions the conclusion of the assistant district attorney representing the prosecution in connection with the coram nobis that the "actual possession" claim was unpreserved. In particular, the Court notes that at the end of his instructions, the trial judge asked counsel whether there were "any requests or exceptions to the charge other

than those previously made a part of the record[.]" T.947. Both defense attorneys and the prosecutor responded in the negative. T.947-48. Arguably, then, at least the judge and the trial attorneys understood the "actual possession" claim to be preserved.

However, even assuming that the "actual possession" claim was preserved for appellate review,[3] the Court cannot find that Petitioner was prejudiced by appellate counsel's failure to incorporate into the brief because, as the Appellate Division found on appeal, the evidence was legally sufficient for the jury to find that Petitioner "actually possessed" the handgun found later on co-defendant's person.

It is true that, as a matter of New York law, a defendant's statement that he is in possession he is in possession of a dangerous instrument, standing alone, does not supply sufficient proof to establish actual possession of a dangerous instrument at the time of the crime to support the charge of first-degree robbery. Grant, 17 N.Y.3d at 619; see also id. at 620 (finding evidence before the grand jury did not support charge of first-degree robbery under P.L. § 160.15(3) because the only proof introduced that the defendant was in actual possession of a

---

[3] Assuming there was an objection to the charge, the legal sufficiency of the conviction is viewed in light of the court's as requested, rather than as given. Cf. Ford, 11 N.Y.3d at 878 ("Because there was no objection to the charge, however, the legal sufficiency of defendant's conviction must be viewed in light of the court's charge as given without exception[.]") (citations omitted).

dangerous instrument—there, a gun—was the handwritten demand note he passed to the victim; absent some other corroboration that the defendant actually possessed a dangerous instrument, the jury could not have rationally drawn the guilty inference) (citations omitted).

Here, however, there was additional corroborating evidence based on which the jury could find "actual 'employment' of a dangerous instrument[,]" Pena, 50 N.Y.2d at 407 n.2, by Petitioner. The victim, Tally, felt Petitioner press an object into her back as he announced that he had a gun. Immediately after the robbery, Petitioner got into a car with Brandon, who, when apprehended shortly thereafter, had an unloaded but operable handgun tucked into his pants. Viewing the evidence in the light most favorable to the prosecution, all of the circumstantial proof was sufficient for a rational jury to conclude that Petitioner had Brandon's handgun in his possession at the time of the robbery and that he used that handgun to threaten Tally and forcibly steal property from her. See Pena, 50 N.Y.2d at 408 (in first-degree robbery prosecution based on theory that weapon utilized in the offense was a knife, evidence on issue whether knife found in paper bag seized from a defendant subsequent to robbery had been utilized in the robbery was sufficient to sustain defendants' conviction, despite fact that no weapon was observed during the robbery and that robbers, one of whom had held a paper bag, had threatened to shoot victim rather than stab him). Therefore, the Court finds that the outcome of

Petitioner's appeal would not have been different, even if appellate counsel had raised the "actual possession" claim on appeal.

### b.    Ineffectiveness of Trial Counsel

Petitioner also asserts that appellate counsel was ineffective in declining to assert the various claims of ineffective assistance of trial counsel discussed above in this Decision and Order. As this Court has already concluded, the predicate claims of ineffective assistance of trial counsel are meritless, because trial counsel's performance did not run afoul of Strickland. The Court also concludes that trial counsel's performance satisfied the New York state-law standard of "meaningful representation" applied to claims of ineffective assistance. See People v. Henry, 95 N.Y.2d 563, 565 (2000) (representation is considered effective if it is meaningful when viewed generally and as of the time it is rendered). It necessarily follows that Petitioner's claim that appellate counsel rendered ineffective assistance by failing to assert the ineffective trial counsel claims on appeal is also meritless. E.g., Geraci v. Senkowski, 23 F. Supp.2d 246, 254-55 (E.D.N.Y. 1998), aff'd, 211 F.3d 6 (2d Cir.), cert. denied, 531 U.S. 1018 (2000); Hernandez v. Edwards, 98 Civ. 6704, 2001 WL 575594, at *7 (S.D.N.Y. May 29, 2001).

## V.   Conclusion

For the foregoing reasons, Petitioner's application for a writ of habeas corpus is denied, and the petition (Dkt #1) is dismissed.

-28-

Because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     April 21, 2014
           Rochester, New York